NATHANIEL BURWELL, COMPLAINANT AND APPELLANT, *v.* DANIEL CAWOOD, WILLIAM C. GARDNER, EXECUTOR OF JOSEPH MANDEVILLE, DECEASED, AND JOHN WEST, DEFENDANTS.

Although by the general rule of law, every partnership is dissolved by the death of one of the partners, where the articles of co-partnership do not stipulate otherwise, yet either one may, by his will, provide for the continuance of the partnership after his death; and in making this provision, he may bind his whole estate or only that portion of it already embarked in the partnership.

But it will require the most clear and unambiguous language, demonstrating in the most positive manner that the testator intended to make his general assets liable for all debts contracted in the continued trade after his death, to justify the court in arriving at such a conclusion

Where it appears, from the context of a will, that a testator intended to dispose of his whole estate, and to give his residuary legatee a substantial, beneficial interest, such legatee will take real as well as personal estate, although the word "devisee" be not used.

THIS was an appeal from a decree of the Circuit Court of the United States for the District of Columbia, holden in and for the county of Alexandria, sitting as a court of equity.

The case was this.

In July, 1836, Joseph Mandeville and Daniel Cawood, both of the town of Alexandria, entered into articles of co-partnership, under the firm of Daniel Cawood and Company, which was to continue until the 1st of September, 1838. Numerous stipulations were made, which it is not necessary to mention.

In June, 1837, Mandeville made his will, which began thus:

"I, Joseph Mandeville, of Alexandria, in the District of Columbia, thankful to Divine Providence, which has ever rewarded my industry and blessed me with a fair portion of health, do hereby direct the disposal which I desire of my earthly remains, after my decease, and of such real and personal property as I may possess when called hence to a future state."

After sundry legacies, he said: "If my personal property should not cover the entire amount of legacies I have or may give, my executors will dispose of so much of my real estate as will fully pay them," and then added:

"John West, formerly of Alexandria, now of Mobile, I hereby make my residuary legatee, recommending him to consult with, and follow the advice of, my executors in all concerning what I leave to him."

Robert J. Taylor and William C. Gardner were appointed executors.

In July, 1837, the following codicil was added:

*Codicil to the preceding will, made this eleventh day of July, 1837.*

It is my will that my interest in the co-partnership subsisting between Daniel Cawood and myself, under the firm of Daniel Cawood and Company, shall be continued therein until the expiration of the term limited by the articles between us; the business to be conducted by the said Daniel Cawood, and the profit or loss to be distributed in the manner the said articles provide.

In witness whereof I have hereto subscribed my name.

JOSEPH MANDEVILLE.

Shortly after adding the above codicil, Mandeville died, in July, 1837. Taylor announced the executorship, and Gardner obtained letters testamentary upon the estate.

Cawood and Company continued to carry on the business as before.

In July, 1838, the following note was given and draft drawn:

Dolls. 800. *Alexandria, 23th July, 1838.*

Thirty days after date, we promise to pay to the order of Mr. N. Burwell, eight hundred dollars for value received, negotiable and payable at the Bank of Potomac.  DANIEL CAWOOD and Co.

Dolls. 1000. *Alexandria, 28th July, 1838.*

On the 31st inst. pay to the order of Mr. Wm. H. Mount one thousand dollars for value received, and charge to account of yours.

NATH'L BURWELL.

To Daniel Cawood and Co., Alexandria, D. C.

Accepted,  DAN'L CAWOOD and Co.

Neither the note nor draft was paid at maturity, and both were protested.

In December, 1838, Burwell, the appellant in the present case, filed a bill on the equity side of the Circuit Court against Cawood and Gardner, reciting the above facts and praying relief.

In June, 1839, Gardner answered. He admitted those facts, but denied that the assets in his hands as executor were liable to the payment of the debts of the firm of Daniel Cawood and Company, and required the complainant to make proof of it. He further alleged a deficiency of personal assets.

In October, 1839, Cawood filed his answer, admitting, in substance, the facts set forth in the bill, but neither admitted nor denied the insolvency of the firm.

The case was referred to a commissioner with instructions to adjust the accounts of the executor and also of the firm of Cawood and Company.

In May, 1841, the commissioner made an elaborate report, the particulars of which it is not necessary to state.

In November, 1841, on the motion of John West, claiming to be interested in the subject-matter of the suit, it was ordered by the court that the complainant have leave to amend his bill and make John West a defendant. The case was again referred to a commissioner with instructions to state, settle, and report to the court the account of William C. Gardner as executor of Joseph Mandeville, deceased, stating the personal estate of the said Mandeville left by him at his death, and how much thereof has come to the hands of the executor, the value of it, and how the same have been disposed of; particularly whether any of the legacies have been paid out of the personal estate, and to what amount; and also the value of the personal assets still in the hands of the executor; and that he report any special matter that he may deem pertinent, or either party may require.

In December, 1841, the complainant, under the above order, filed his amended bill, making West a party.

In April, 1842, West demurred to the bill, because the other legatees of Mandeville were not made defendants, and because the complainant had not, by his bill, shown a case in which he was entitled to relief.

In May, 1842, the commissioner made a report, under the above reference, stating that Gardner, as executor, had then in his hands, assets, amounting to $1036 70.

In June, 1842, the demurrer was argued, and the court being of opinion that the general assets of the estate of the said Joseph Mandeville, deceased, in the hands of his executor, William C. Gardner, one of the said defendants, are not chargeable with any debt contracted by the defendant Cawood, in the name of the firm of Daniel Cawood and Co., after the death of the former partner of the firm, the said Joseph Mandeville; and being of opinion that the defendant's said demurrer is well taken and fully sustained in argument, and that the complainant's bill contains no matter, allegation, or

charge laying any foundation for equitable relief in the premises, dismissed the bill with costs.

The complainant, Burwell, appealed from this decree.

*Neale* and *Coxe*, for the appellant.
*Smith* and *Jones*, for the defendants.

*Neale*, for the appellant, contended,

1. That all the necessary and proper parties were before the court below.

2. That John West was not a necessary or proper party, he being the residuary legatee of the late Joseph Mandeville, and the bill only sought to make the personal estate of Mandeville liable.

3. That the surviving partner being insolvent, the creditors were well warranted in filing their bill in equity against the executor of Mandeville and the surviving partner.

4. That the general assets of the estate of Mandeville are liable for the debts contracted, as well after as before Mandeville's death, by the late firm of Daniel Cawood and Co.

5. That Mandeville's real estate descended upon his heirs-at-law.

If the surviving partner be insolvent, the effects in the hands of the legal representatives of the deceased partners are liable in equity for the partnership debts. Such debts are both joint and several, and equally a charge upon the assets of the deceased partner, and against the person and estate of the surviving partner. 3 Kent's Commentary, 57; Hamersly *v.* Lambert, 2 Johns. Ch. Rep. 508; Devaynes *v.* Noble, 1 Merivale's Rep. 539; 3 Leigh, 548.

A creditor of a firm may sue the surviving partner and the legal representative of a deceased partner, for payment out of the assets of the deceased partner, without showing the insolvency of the surviving partner. Wilkinson and Henderson, 1 Mylne and Keene's Rep. 582.

And relief may be had in equity against the legal representative of a deceased partner, if the surviving partner be insolvent. Jenkins and De Groot, 1 Caines's Cases in Error, 122.

In this case, Cawood, the surviving partner, is notoriously insolvent.

A joint creditor may file a bill in equity against the legal representative of a deceased partner, although the surviving partner be not insolvent. He is not compelled to sue the survivor in the first instance. Mylne and Keene's Rep. 582; 1 Merivale's Rep. 529, 563; Collyer on Partnership, 343, 346.

From the record in the cause, it appears that Mandeville died in July, 1837, more than a year before the time, when the partnership by its terms expired, to wit: the 1st September, 1838.

Had Mandeville lived until the 1st September, 1838, and the debt of the complainant been contracted before that date, there can be no doubt, that on failure of partnership funds to pay the claim, the separate property of both partners would be liable for the payment of it.

If so, does not the codicil to Mandeville's will place the creditors subsequently to his death, and before the 1st September, 1838, (when the *post mortem* partnership expired,) on the same footing that they would have been had Mandeville lived until the 1st of September, 1838 ?

If this was not the intention of Mandeville, when he added the codicil to his will, then, in effect it was a fraud upon the public ; for it was the general opinion where the *post mortem* partnership was carried on, that Mandeville's estate, or the general assets of his estate, were bound in common with the company or social funds.

By the codicil to his will, Mandeville directs that his interest in the co-partnership of Daniel Cawood and himself, under the firm of Daniel Cawood and Co., shall be continued therein until the expiration of the time limited by the articles of co-partnership. The business to be conducted by Daniel Cawood, and the profit and loss to be distributed in the manner the articles provide.

The articles of co-partnership do not state what is the amount of capital put in by either party, all it states is the money or goods then furnished or that might thereafter be put in by either party, shall stand to his credit in account current, and bear interest—and all profits and losses to be equally divided.

If, then, the articles of co-partnership would have bound the general assets of Mandeville had he lived until the 1st September, 1838, (assuming that at that time the firm was insolvent,) then we contend that the codicil makes his estate equally liable for all debts contracted by Daniel Cawood and Co. prior to the 1st September, 1838, although Mandeville died in July, 1837. Because, if he could bind his estate by deed while living, so could he, by will, after his death— and in this case the codicil to his will affirms the obligation and continues his liability under the deed of co-partnership, until the 1st September, 1838. It is conceded, that he might have limited his liability, either in the articles of co-partnership or in the codicil to his will, but not having done so in either, and coupling the two papers

together, the only fair construction to be put upon them both, makes his estate generally liable for all debts due from the late firm of Cawood and Co. prior to the 1st September, 1838, less what that firm is able to pay towards their discharge. 7 Peters, 586.

Had the firm of the late Daniel Cawood and Co. made money, to whom would the profits have belonged, after payment of Mandeville's debts and legacies? Clearly and beyond all doubt, to John West, the residuary legatee; and who would have claimed those profits? the answer is, John West; and he could and he would have successfully claimed them, for as residuary legatee, he, and he alone, would have been entitled to them under Mandeville's will, and bad must be the rule which works only one way. Entitled, then, to the profits, with the right to demand them, and, still more, to coerce their payment if refused, he should, upon principles of equality and justice sustain losses,if any were made. And it is worthy of remark that although Mr. West removed to the town of Alexandria immediately after Mandeville's death—was present when the will was probated in the Orphans' Court of Alexandria county, September, 1837, and well knew the contents of Mandeville's will and codicil thereto—and was also an eye-witness to Cawood's proceedings under the codicil, yet did he remain entirely silent upon the subject, thereby acquiescing therein, as it would certainly seem, until the November term, 1841, of the Circuit Court of Alexandria county, when, for the very first time, we were informed that he intended to defeat, if he could, all claims on Mandeville's estate, contracted with the firm of Daniel Cawood and Co. subsequent to the death of Mandeville, however just they might be. Does he then come into court with clean hands and for just purposes?

Had he intimated his intention, as here stated, before the credits were given, none would ever have been given; for it was perfectly notorious, to every person dealing with the firm of Daniel Cawood and Co., that the surviving partner was utterly insolvent from the beginning to the ending of his connection in business with the late Mr. Mandeville, unless the business should prove a profitable one.

West being, by the will, the recipient of the profits, after payment of debts and legacies, had a direct interest in the business, and having such interest, may be looked upon as a *quasi* partner therein, and consequently his right to the residuum of Mandeville's estate is in subordination to the paramount claims of *bona fide* creditors.

The essence of a partnership consists in the mutual participation

3 B

of profit and loss; there can be no partnership without this.   If the testator by his will continues the partnership after his death, (as in this case,) he continues it for the benefit of his representatives; he makes them partners with the surviving partner; they are entitled to a joint participation in the profits, and ought they not, in sheer justice, to bear their portion of all losses?   For if they did not, the distinctive features of a partnership would be lost sight of.

Mandeville, by his will, directs the partnership subsisting between him and Cawood to be continued for the period fixed by the articles; and the profit or loss, of the same, to be shared, as provided by them.   The articles are thus made part of the will.   The intention of the testator must govern; it is the " polar star which is to guide the decision," and the intention must be gathered from the testator's language.   In this case, there is neither a patent nor latent ambiguity on the face of the will or the articles of co-partnership—it is therefore clear (judging from the language employed in both) that Mandeville intended a continuance of the partnership, under the terms and conditions of the articles, according to their expressed as well as legal effect.   They expressly provide for an equal participation in the profits, and an equal burden in all losses; their legal effect is, to render liable the general estate of both parties, to the just claims of creditors, in the event of losses.   Now if the partnership is continued in the same manner after the testator's death, by his express directions, as it existed before, must not his estate be liable to the demands of subsequent creditors?

If this is not so, then in the event of heavy profits his estate is entitled to an equal portion, but if there are losses, however large, his estate is exonerated—the whole falls on the surviving partner—ruinous to him and unjust and fraudulent as to creditors!   This negatives the idea of a partnership, which is a communion, not of profit alone, but also of loss.   This case is distinguishable from that of Pitkin and Pitkin, 7 Conn. Reports, 307.   The testator in that case directed, that his interest, consisting of so much, to wit: (here he specifically enumerates it,) is to be continued in the firm, after his death, for the term of four years.   His interest, which is thus continued, is clearly defined, and clearly restricted, and is not a general direction of the continuance of the partnership.   This language is too plain for creditors to misunderstand or misinterpret, and if under such circumstances they trust the partnership, which finally proves insolvent, they have no right to look to the general assets of the testator,

for he has only pledged so much for the partnership engagements, of which the creditors had due notice, and if they suffer, it is the result of their own imprudence.    The distinction is plain and obvious: one is a general partnership, wherein the separate estate of each party is liable; the other, a special partnership, of which creditors had notice, and therefore they can only look to those funds specially provided to meet all losses.    Were it otherwise, there would be no difference between a general and special partnership.

But the appellee, in the court below, contended that the demurrer was well taken and would hold, and cited the following authorities in support thereof, to wit:—Edwards on Bills and Pleadings, 123; 1 Johns. Chan. Reports, 438; 1 Sch. and Lefroy, 386; 2 Sch. and Lefroy, 159; 3 Maddock's Chancery Reports, 791; Mylne and Keene's Reports, 116.    And it was further contended, that upon a fair construction of Mr. Mandeville's will, John West is residuary devisee, and not, as declared by the testator, residuary legatee.

As to a fair construction of the will—is Mr. West a residuary devisee, or residuary legatee?

Mandeville, the testator, by his will, makes him, in plain terms, his residuary legatee, and upon a careful inspection of the whole will it is not perceived how he is to be considered a residuary devisee. Mr. Mandeville was a remarkably intelligent man,—well understood the true import of words, and if he intended to make Mr. West his residuary devisee, why did he not say so?    Why speak of his "heirs" if he intended that Mr. West should be his residuary devisee?    If residuary devisee, then there was an end to all heirships, and the reason which he assigned for appointing two executors was just as false as it was clearly absurd.    Assuming, then, that he well understood the technical meaning of "residuary legatee," then Mr. West should not have been made a party—and touching the construction of wills, we find, in the great case of Thelluson and Woodford, 4 Ves. jun. 329, that the Master of the Rolls, when deciding upon that case, makes, among others, these remarks: "The intention is to be collected from the whole will taken together. Every word is to have its effect.    Every word is to be taken according to the natural and common import; and if words of art are used, they are to be construed according to the technical sense, unless upon the whole will it is plain the testator did not so intend." So in Kennon and McRoberts and wife, 1 Wash. Rep. 130, the president of the court observes:    "In Hodgson and Ambrose,

Doug. 323, a distinction is made which seems to be a sensible one, to wit: ' If the testator use legal phrases, his intention should be construed by legal rules: if he'use those that are common, his intention, according to the common understanding of the words he uses, shall be the rule.' "

The above are a few of the many cases that might be adduced, but they are deemed quite sufficient for the present occasion.

As to the authorities relied on :

So far from ousting the court of jurisdiction in this case, they most conclusively establish it; consequently, they must have been cited and relied on to sustain that part of the demurrer which objects for want of proper parties, and as such we shall shortly review them.

Edwards on Bills and Pleading, 123. In that case it is said: " If a testator directs his debts to be paid out of his personal property, and the deficiency to be made up out of his real estate, and the personal property is not sufficient to pay the debts, a judgment creditor will have to make the personal representative and heir-at-law parties." Is Mr. West an heir-at-law in this case? Again, in the same book and same page, "neither the heir-at-law nor the personal representative were parties; in fact, the will had not been proved; there was no personal estate, and the executor refused to act, but the Master of the Rolls (Leach) ordered it to stand over for administration with the will annexed, and with leave to make the administrator and heir parties."

In the present case, has not the will been proved; the personal estate ascertained and duly administered, and a deficiency of personal assets clearly shown?

Where, then, is the analogy? and was this case decided under the influence of the statute of the 5 Geo. 2, ch. 7, or was it made upon common law principles? This would seem to be a necessary inquiry, because that statute enlarges the remedies of judgment creditors against the real estate of their debtors.

The cases of Giffard and Hart, reported in 1 Sch. and Lefroy, 386, and Plunket and Joice, 2 Sch. and Lefroy, 158, have no application to the present case, unless it shall first be made clearly to appear that the appellee occupies the same ground that he would do were he the heir-at-law of the late Mr. Mandeville.

Wiser v. Blachly et al., 1 Johns. Chan. Rep. 437. In this case the chancellor permitted the devisee of Vail to be made a party, because he had a direct interest in the event of the suit—was devisee;

and the bill sought to make liable the timber on the very land devised to him. But in the present case, is West devisee? Very different are the rights of devisees and legatees; a difference too well defined and understood to need the slightest notice on our part. But these principles have no application to the present case, inasmuch as the bill does not seek to charge the real assets.

The case Ex parte Garland, 10 Ves. jun. 110 *et seg*. also relied on to defeat this claim, has no bearing upon the merits of this cause. There a certain sum, to wit £600, was embarked in the trade by the testator, and no more; and that trade carried on by the widow and executrix of the testator, and not by a copartner, under original articles of copartnership with the testator, wherein no sum is named, as in this case. In that case, distribution had long been made before the bankruptcy of the executrix; in this case, none has ever been made—in that case, the profits of the trade were to be applied for his widow's use, and for the maintenance and education of his children; but in this case, the profits, (if any) are to become a part of Mr. Mandeville's personal estate. Where, then, is the similarity between the two cases? It scarcely deserves, *en passant*, a notice. The Lord Chancellor in his decree employs the following language: "in this case," he remarks, "I fear I shall be under the necessity of contradicting the authority of a judge I most highly respect, feeling a strong opinion that only the property declared to be embarked in the trade, shall be answerable to the creditors of the trade. If I am not bound by decision, the convenience of mankind requires me to hold, that the creditors of the trade, as such, have not a claim against the distributed assets, in the hands of third persons under the direction of the same will which has authorized the trade to be carried on for the benefit of other persons. My opinion upon this case is, that it is impossible to hold that the trade is to be carried on, perhaps for a century, and at the end of that time the creditors dealing with the trade, are, merely because it is directed by the will to be carried on, to pursue the general assets distributed, perhaps to fifty families."

But in this case, it was to be carried on, for about thirteen or fourteen months only, and without the slightest inconvenience either to "mankind" generally, or to the devisees and legatees of Mr. Mandeville in particular; nor has there been a distribution, either in part, or whole, of Mr. Mandeville's personal estate. Wherein, we again ask, do the cases assimilate?

Ex parte Richardson et al. in re Hodgson et al. 3 Maddock's Chan. Rep. 79.

This case stands upon the same ground of Ex parte Garland, and consequently, this, like that case, is clearly distinguishable from the case now before the court, for the reasons already stated in regard to that case.    Thompson and Andrews, 1 Mylne and Keene's Rep. 116.

This case bears no analogy whatever to the case now under consideration, and is very similar to the two preceding cases of Ex parte Garland, and Ex parte Richardson and others.    In this case, the tes-tator merely expresses a wish, that the trade may be carried on by his widow and son, after his death, " for their joint benefit and mutual advantage."    And in furtherance thereof, gives and bequeaths to them, all his " stock in trade of what nature or kind soever," by him " employed or used in said trade," claiming in no manner any future interest therein; consequently they traded on their own property, for their own benefit, and not upon the testator's, for he had embarked nothing therein, and therefore the creditors must have known upon whose responsibility they dealt, and we are entirely at a loss to ima-gine how this can be considered a *post mortem* partnership, and if not a partnership, by what legal ways and means could the testator's estate be liable.

In support of the 5th point, Mr. *Neale* referred to the following au-thorities:

3 Bos. and Pul. 620; 6 Cruise, 206, 207; 3 Mumf. 76; 3 East, 516; 2 Mod. 313, 314; 12 Mod. 593; 1 Ves. and Beames, 410; Doug. 739; 2 Cowp. 657; 1 Swanston, 201.

*Smith,* for the defendant West, stated the following preliminary propositions:

1. That by a fair construction of the will, the entire real and per-sonal estate (except the interest in the firm of Cawood and Company) vested in West as general residuary devisee and legatee, subject only to debts and legacies.

After showing, with some minuteness, how far the courts in Eng-land had gone in order to carry out the intention of the testator, he referred to the cases of 3 Peters, 346, and 6 Peters, 68.

The introductory words of the will show an intention, in the tes-tator, to part with his whole estate.    To show the weight which courts have attached to the introductory clause of a will, and also what particular words and expressions, other than words of perpetuity

have been regarded as sufficient in devisees to pass an estate in fee, he cited, Forrester's Rep. (or Cas. temp. Talbot,) 157; 2 Atk. 37; 3 P. Wms. 295; 1 Wilson, 333; 2 Vern. 690; Preston on Estates, 90 *et seq.* 1st Am. ed.; 6 Com. Law Rep. 191; 1 Johns. Chan. Rep. 494; 3 Cranch, 97; 1 Wash. 96; 3 Rand. 280.

The word "property" is sufficiently extensive, in connection with the general residuary clause, to pass real and personal estate.   1 Rev. Code of Va. 369, chap. 99, sect. 27; 11 East, 288, 516; 14 East, 368, 17 Com. Law Rep. 280, 289; 2 Des. Chan. Rep. 573; 6 Serg. and Rawle, 452; 1 Wash. Va. Rep. 45, 262; 11 East, 321; 1 Taunt. 288; 2 Vern. 564; 5 Burr. 26, 38; 1 Hen. Bla. 223; 5 Taunt. 268;

[Mr. *Smith* here analyzed the clauses of the will.]

Even the word "legacy" may be applied to real estate, if the context of the will shows that such was the testator's intention.   1 Burr. 268; 5 Term Rep. 716; 11 East, 245; 15 East, 503.

2. That being directly and materially interested in the subject in controversy, West is a proper party.   1 Johns. Chan. Rep. 437; 3 Johns. Chan. Rep. 553.

3. That the general assets of the testator are not liable to the claim of the plaintiff in error; it being contracted since Mandeville's death. And that the testator, by the terms of his will, left nothing more at stake in the concern of Cawood and Company than his interest in the co-partnership at the time of his death

A testator may sever a portion from the main body of his estate to follow the hazards of a trade; and the general assets, in such case, are not responsible.

The only case denying this is Hankey *v.* Hammond, Cooke's Bankrupt Law, 5th ed. p. 67, cited in a note to 3 Madd. Chan. Rep. 148.   But this doctrine is reviewed in Ex parte Garland, a leading case, 10 Ves. jun. 110.   The latter case is supported by Ex parte Richardson, 3 Madd. Chan. Rep. 138, 157; also, in 1 Mylne and Keene, 116, the case of Ex parte Garland is reviewed and sustained. See also, Pitkin *v.* Pitkin, 7 Conn. Rep. 307, where there is a strong analogy to the case at bar.

The doctrine of Ex parte Garland has become incorporated into the elementary books.   3 Com. Dig. 609, pl. 12; 2 Madd. Chan. 651; 2 Roberts on Wills, 123.

[Mr. *Smith* here compared the case at bar with the cases cited above.]

4. The general assets of the testator, not being liable to the com-

plainant's demand, and such liability being the only ground for equitable relief, the demurrer was properly sustained, and the bill dismissed as to all the defendants. 1 Gallison, 630; 2 Vern. 292; 1 P. Wms. 682; 2 Ves. 101.

*Jones*, on the same side, said, that West had a right to be a party. Legatees are generally considered to be represented by executors, but it is not error if a legatee be made a party. Calvert on Parties, 20, 21, 149, 171, 172.

It was a matter of discretion in the court below; and this court will not review it.

The executor did not file a proper answer, because he impliedly admitted that the estate was bound. He is a creditor.

The case in 11 Serg. and Rawle, 41, relied on by the other side, is not in point, because there was an article in the original partnership for carrying it on.

*Coxe*, in reply and conclusion.

The counsel on the other side have not kept within the record. The surviving partner became insolvent, but the record does not show how. All parties considered the firm as the same after the death of Mandeville as it had been before; the executor, surviving partner and all; and the bill only charges the personal estate, not the real.

Was it necessary to make the devisee a party? The authorities are collected in Story's Eq. Plea. 135, 140, 141, 148, 150, 155.

The court would not dismiss the bill because the devisee was not made a party. 4 Wash. C. C. R. 202, 208; 3 Cranch, 227.

Cawood is certainly liable because he contracted the debt. Have we mistaken our remedy against him? We call upon him to account, which is a matter peculiarly appropriate to equity. If the bill is good against him alone, it ought not to have been dismissed.

A partnership can go on by will. 7 Peters, 594; 11 Serg. and Rawle, 41.

Story on Partnership, sect. 195, 196. If it is restricted or limited, the burden of proving it is on the other side.

In Ex parte Garland there was a limited sum left for the use of the firm.

In 3 Maddock, 145, each party put in a specific sum, and the court ordered an account up to the time of the death; and said it depended on the will how the business was to be carried on.

Mylne and Keene, 116, is like the case in Maddock.   As to the case in 7 Cowen, Rep. 312, limited partnerships are recognised in that state.

Mr. Justice STORY delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the District of Columbia, sitting in equity in the county of Alexandria.

On the 9th of July, 1836, Joseph Mandeville, deceased, by certain articles then executed, entered into partnership with Daniel Cawood, one of the defendants, for the term of three years from the 1st of September, 1835, under the firm of Daniel Cawood and Company. On the 3d of June, 1837, Mandeville made his last will, by which in the introductory clause he said : " I do hereby direct the disposal which I desire of my earthly remains after my decease, and of such real and personal property as I may possess when called hence to a future state."   He then proceeded to make sundry bequests of his real and personal estate to different persons ; and then added : " If my personal property should not cover the entire amount of legacies I have or may give, my executors will dispose of so much of my real estate as will fully pay the same."   He immediately added : " John West, one of the defendants, formerly of Alexandria, now of Mobile, I hereby make my residuary legatee, recommending him to consult with and follow the advice of my executors in all concerning what I leave to him."   The testator on the 11th of July, 1837, made the following codicil to his will.   " It is my will that my interest in the copartnership subsisting between Daniel Cawood and myself, under the firm of Daniel Cawood and Company, shall be continued thereon until the expiration of the term limited by the articles between us ; the business to be continued by the said Daniel Cawood, and the profit or loss to be distributed in the manner the said articles provide."   The testator appointed Robert J. Taylor and William C. Gardner (one of the defendants) executors of his will, and died in July, 1837.   His will and codicil were duly proved after his death, and Taylor having renounced the executorship, Gardner took upon himself the administration of the estate under letters testamentary granted to him by the Orphans' Court of Alexandria county.

Cawood, after the testator's death, carried on the copartnership in the name of the firm, and failed in business before the regular expiration thereof, according to the articles.

The present bill was originally brought against Cawood and Gardner, as executors of Mandeville, by the plaintiff, Burwell, alleging himself to be a creditor of the firm upon debts contracted with him by Cawood, on behalf of the firm, after Mandeville's death, viz. on a promissory note, dated the 28th of July, 1838, for $800, and on an acceptance of a bill of exchange drawn by Burwell on the same day for $1000, in favour of one William H. Mount, both of which remained unpaid. The bill charged the failure of Cawood in trade, and his inability to pay the debts due from the firm. It also charged that Gardner, the executor, had assets sufficient to satisfy all the debts of the testator, and all the debts of Cawood and Company; and it sought payment of the debt due to the plaintiff out of those assets.

The defendant, Gardner, put in an answer denying that he had such accurate information as to enable him to say whether the partnership funds in the hands of Cawood were sufficient to pay the debts of the firm or not; and not admitting that the assets of the testator in his hands were liable to the payment of the debts of the firm, and requiring proof of such liability, and alleging that he had not assets of the testator in his hands sufficient to satisfy the plaintiff's claims, after satisfying two specified judgments.

The defendant, Cawood, not having made any answer at this stage of the cause, the bill was thereupon taken against him pro confesso—subsequently he put in an answer; and thereupon it was, by consent of the plaintiff, and Cawood, and Gardner the executor, referred to a master to take an account of the assets of the testator, of the debts due to him, of the value of his real estate, and to settle the accounts and transactions of the firm of Cawood and Company until its termination, and of the individual partners with the firm, to take an account of the assets of the firm, and the outstanding debts of the firm, and the debts due thereto, &c. ; and also to ascertain whether the debt due to the plaintiff arose in the partnership transactions, and is now due.

Cawood, by his answer, admitted generally the facts stated in the bill; but he also alleged that he neither admitted nor denied the insolvency of the firm, averring that he had satisfied claims against the firm since it terminated to the amount of about $14,000 from the firm funds, and was engaged in the collection of the outstanding debts due thereto, and that the firm still owed debts to the amount of about $7000.

The master made his report in May, 1841; the details of which it

is not necessary to mention.  In November, of the same year, it was referred to another commissioner to take an account of the assets of Mandeville in the hands of his executor, who afterwards made a report accordingly.  At this stage of the proceedings, John West (the residuary legatee, so called in the will) claiming to be interested in the subject-matter, the bill was amended by making West a party; and he filed a demurrer to the bill.  The demurrer was afterwards set down for argument, and the court being of opinion that the assets of Mandeville in the hands of his executor (Gardner) were not chargeable with any debt contracted by Cawood in the name of the firm, after the death of Mandeville, sustained the demurrer, and dismissed the bill with costs.  From this decree of dismissal the present appeal has been taken to this court.

The argument has spread itself over several topics, which are not in our judgment now properly before us; whatever may have been their relevancy in the court below.  The real question, arising before us upon the record, is, whether the general assets of the testator, Mandeville, in the hands of his executor, are liable for the payment of the debt due to the plaintiff, which was contracted after Mande-ville's death.  If they are not, the bill was properly dismissed,
ever might be the remedy of the plaintiff against Cawood, if the suit had been brought against him alone, for equitable relief, upon which we give no opinion.  In general the surviving partner is liable at law only; and no decree can be made against him, although he may be a proper party to the suit in equity, as being interested to contest the plaintiff's demand, unless some other equity intervenes; and so it was held in Wilkinson *v.* Henderson, 1 Mylne and Keene, 582, 589.

The bill, as framed, states the insolvency of Cawood, and seeks no separate relief against him, and therefore, if it is maintainable at all, it is so solely upon the ground of the liability of the general assets of Mandeville to pay the plaintiff jointly with the partnership funds in the hands of Cawood.  In respect to another suggestion, that West was not a necessary party to the bill, in his character of residuary legatee of the personalty, that may be admitted; at the same time it is as clear, that as he had an interest in that residue, if Mandeville's general assets were liable for the plaintiff's debt; and therefore, the plaintiff might at his option join him in the suit, and if West did not object, no other person would avail himself of the objection of his misjoinder.

Then, as to the liability of the general assets of Mandeville in the hands of his executor for the payment of the plaintiff's debt—we are

of opinion that they are not so liable; and shall now proceed to state the reasons for this opinion.

By the general rule of law, every partnership is dissolved by the death of one of the partners.(*a*)   It is true that it is competent for the partners to provide by agreement for the continuance of the partnership after such death; but then it takes place in virtue of such agreement only, as the act of the parties, and not by mere operation of law. A partner too may by his will provide that the partnership shall continue notwithstanding his death; and if it is consented to by the surviving partner, it becomes obligatory, just as it would, if the testator, being a sole trader, had provided for the continuance of his trade by his executor, after his death.   But, then, in each case the agreement or authority must be clearly made out; and third persons, having notice of the death, are bound to inquire how far the agreement or authority to continue it extends, and what funds it binds, and if they trust the surviving party beyond the reach of such agreement, or authority, or fund, it is their own fault, and they have no right to complain that the law does not afford them any satisfactory redress.

A testator, too, directing the continuance of a partnership, may, if he so choose, bind his general assets for all the debts of the partnership contracted after his death.   But he may also limit his responsibility, either to the funds already embarked in the trade, or to any specific amount to be invested therein for that purpose; and then the creditors can resort to that fund or amount only, and not to the general assets of the testator's estate, although the partner, or executor, or other person carrying on the trade may be personally responsible for all the debts contracted.   This is clearly established by the case Ex parte Garland, 10 Ves. 110, where the subject was very fully discussed by Lord Eldon, and Ex parte Richardson, 3 Madd. 138, 157, where the like doctrine was affirmed by Sir John Leach, (then Vicechancellor,) and by the same learned judge, when Master of the Rolls, in Thompson *v.* Andrews, 1 Mylne and Keene, 116.   The case of Hankey *v.* Hammock, before Lord Kenyon, when Master of the Rolls, reported in Cooke's Bankrupt Law, 67, 5th ed., and more fully in a note to 3 Madd. Rep. 148; so far as may be thought to decide that the testator's assets are generally liable under all circumstances, where the trade is directed to be carried on after his death, has been completely overturned by other later cases, and expressly overruled by Lord Eldon in 10 Ves. 110, 121, 122, where he stated that it stood

(*a*) See Scholfield *v.* Eichelberger, 7 Peters, 586.

alone, and he felt compelled to decide against its authority: The case of Pitkin *v.* Pitkin, 7 Conn. Rep. 307, is fully in point to the same effect, and indeed, as we shall presently see, runs *quatuor pedibus* with the present.

And this leads us to remark, that nothing but the most clear and unambiguous language, demonstrating in the most positive manner that the testator intends to make his general assets liable for all debts contracted in the continued trade after his death, and not merely to limit it to the funds embarked in that trade, would justify the court in arriving at such a conclusion from the manifest inconvenience thereof, and the utter impossibility of paying off the legacies bequeathed by the testator's will, or distributing the residue of his estate, without in effect saying at the same time that the payments may all be re-called, if the trade should become unsuccessful or ruinous. Such a result would ordinarily be at war with the testator's intention in bequeathing such legacies and residue, and would, or might postpone the settlement of the estate for a half-century, or until long after the trade or continued partnership should terminate. Lord Eldon, in 10 Ves. 110, 121, 122, put the inconvenience in a strong light, by suggesting several cases where the doctrine would create the most manifest embarrassments, if not utter injustice; and he said, that the convenience of mankind required him to hold, that the creditors of the trade, as such, have not a claim against the distributed assets in the hands of third persons, under the directions in the same will, which has authorized the trade to be carried on for the benefit of other persons. This, also, was manifestly the opinion of Sir John Leach in the cases 3 Madd. Rep. 128; 1 Mylne and Keene, 116, and was expressly held in the case in 7 Conn. Rep. 307.

Keeping these principles in view, let us now proceed to the examination of the will and codicil in the present case. There can, we think, be no doubt, that the testator intended by his will to dispose of the whole of his estate, real and personal. The introductory words to his will already cited, show such an intention in a clear and explicit manner. The testator there says: "I do hereby direct the disposal which I desire of my earthly remains after my decease, and of such real and personal estate as I may possess, when called hence to a future state." He, therefore, looks to the disposal of all the estate he shall die possessed of. It is said that, admitting such to be his intention, the testator has not carried it into effect; because the residuary clause declares John West his "residuary legatee" only, and

not his residuary devisee also ; and that we are to interpret the words
of the will according to their legal import as confined altogether to
the residue of the personal estate.    This is, in our judgment, a very
narrow and technical interpretation. of the words of the will.    The
language used by the testator shows him to have been an unskilful
man and not versed in legal phraseology.    The cardinal rule in the
interpretation of wills is, that the language is to be interpreted in sub-
ordination to the intention of the testator, and is not to control that
intention, when it is clear and determinate.    Thus, for example, the
word " legacy" may be construed to apply to real estate where the
context of the will shows such to be the intention of the testator.
Thus in Hope *v.* Taylor, 1 Burr. Rep. 269, the word " legacy" was
held to include lands, from the intention of the testator deduced from
the context.    The same doctrine was fully recognised in Hardacre
*v.* Nash, 5 Term Rep. 716.    So, in Doe dem. Tofield *v.* Tofield,
11 East, 246, a bequest of " all my personal estates" was con-
strued upon the like intention to include real estate.    But a case
more directly in point to the present, and differing from it in no
essential circumstances, is Pitman *v.* Stevens, 15 East, 505.    There
the testator, in the introductory clause of his will, said : " I give and
bequeath all that I shall die possessed of, real and personal, of what
nature and kind soever, after my just debts is paid.    I hereby appoint
Capt. Robert Preston my residuary legatee and executor."    The
testator then proceeded to give certain pecuniary legacies, and finally
recommended his legatee and executor to be kind and friendly to his
brother-in-law J. C., &c., and begs him to do something handsome
for him at his death, &c.    The question was, whether Preston was
entitled to the real estate of the testator, under the will ; and the
court held that he was ; and that the words " residuary legatee and
executor," coupled with the introductory clause and the recommend-
ation clearly established it.    Upon that occasion, Lord Ellenborough,
after referring to the words of the introductory clause, said : " Then
he appoints Capt. P. his residuary legatee and executor—residuary.
legatee and executor of what ? of all that he should die possessed of,
real and personal, of what nature and kind soever ; that is, of all he
should not otherwise dispose of.    The word ' legatee,' according to
the cases, particularly Hardacre *v.* Nash, may be applied to real
estate, if the context requires it, as was said by Lord Kenyon upon
the word ' legacy.'    Then, in the subsequent parts of the will, he con-
templates that his residuary legatee and executor will have the dis-

position of his whole funds, but after some legacies and annuities, he recommends him to be kind and friendly to his brother-in-law, &c."

In the present case it is plain that the testator contemplated some positive benefit to West, when he designated him as his residuary legatee; and yet, at the same time, he contemplated that his personal property might not be sufficient to cover the amount of legacies given by his will; and in that event he directs his executors to dispose of so much of his real estate as will fully pay his legacies; so that, if we restrain the words " residuary legatee" to the mere personalty, we shall defeat the very intention of the testator, apparent upon the face of the will, to give some beneficial interest to West, in an event which he yet contemplated as not improbable. On the other hand, if we give an enlarged and liberal meaning to the residuary clause as extending to the real estate, it will at once satisfy the introductory clause, and upon a deficiency of the personal assets will still leave an ample amount to the beneficiary, who appears to have been an object of the testator's bounty. But if this interpretation should be (as we think it is not) questionable; one thing is certain, and that is, that the testator did not contemplate that his personal assets would not be more than sufficient to pay all his debts; for he does not charge his real estate with his debts, but only with his legacies, in case of any deficiency of personal assets; and the residuary clause, if it were limited to the mere residue of his personal assets would also show that the testator did not provide for any debts which should arise from any subsequent transactions after his death.

If this be so, then we are to look to the codicil to see whether any different intention is there disclosed in clear and unambiguous terms. In the first place, the language of the codicil is just such as the testator might properly have used, if he intended no more than to pledge his funds already embarked in the partnership for the payment of the partnership debts. The codicil says, " It is my will that my ' interest' in the copartnership, &c., shall be continued therein until the expiration of the term limited by the articles." Now, his interest in the firm then was his share of the capital stock and profits, after the payment of all debts and liabilities due by the firm. It is this interest, and not any new capital which he authorizes to be embarked in the firm. He does not propose to add any thing to his existing interest, but simply to continue it as it then was. How, then, can this court say, that he meant to embark all his personal assets in the hands of his executor as a pledge for the future debts,

or future responsibilities or future capital of the firm? That would be to enlarge the meaning of the words used beyond their ordinary and reasonable signification. And besides, it is plain that the testator did not mean to have the payment of his legacies indefinitely postponed, until the expiration of the articles, and the ascertainment and final adjustment of the concerns of the firm, which might perhaps extend to ten or twenty years. So that to give such an enlarged interpretation to the terms of the codicil, (as is contended for,) for the codicil must be construed as if it were incorporated into the will, would be to subject the legatees to all the fluctuations and uncertainties growing out of the future trade, and might deprive the residuary legatee of every dollar intended for his benefit. There is another consideration of the matter, which deserves notice. Would the real estate of the testator, upon a deficiency of his personal assets, be liable for the debts of the firm contracted after his death, by mere operation of law, as it would be for such debts as were contracted in his lifetime? If it would, then it is apparent, that all the legatees and devisees might in the event of the irretrievable and ruinous insolvency of the firm be deprived of all their legacies and devises, although the legacies were charged upon the real estate. If it would not, then it is equally apparent that the testator did not contemplate any liability of his general assets, real and personal, for the payment of any debts, excepting those which were subsisting at the time of his death. There is yet another consideration, not unimportant to be brought under review. It is, that the whole business of the firm is to be conducted by Cawood alone, and that neither the executor nor the legatees are authorized to interfere with or to scrutinize his transactions. Such an unlimited power over his whole assets by a person wholly unconnected with the administration of his estate could scarcely be presumed to be within the intention of any prudent testator. If to all these we add the manifest inconveniences of such an interpretation of the codicil, thus suspending for an indefinite time the settlement of the estate and the payment of the legacies, it is not too much to say, that no court of justice ought upon principle to favour, much less to adopt it.

And, certainly, there is no authority to support it; at least none, except Hankey *v.* Hammock, which cannot now, for the reasons already stated be deemed any authority whatsoever. On the other hand, the case Ex parte Garland, 10 Ves. 110, and Ex parte Richardson, 3 Madd. Rep. 138, although distinguishable from the present in

Ladiga *v.* Roland et al.

some of their circumstances, were reasoned out and supported upon the broad and general principle that the assets of the testator were in no case bound for the debts contracted after his death by the persons whom he had authorized to continue his trade, but the rights of such new creditors were exclusively confined to the funds embarked in the trade and to the personal responsibility of the party who continued it, whether as trustee, or as executor, or as partner—unless, indeed, the testator had otherwise positively and expressly bound his general assets. The case of Pitkin *v.* Pitkin, 7 Conn. Rep. 307, is, however, (as has been already suggested,) directly in point. There, the testator, by his will directed, "that all his interest and concern in the hat manufacturing business, &c., as then conducted under said firm, should be continued to operate in the same connection for the term of four years after his decease, &c." The court there held, after referring to the cases in 10 Ves. 110, and 3 Madd. Rep. 138, that the general assets of the testator were not liable to the claims of any creditors of the firm who became such after the testator's death; and that such creditors had no lien on the estate in the hands of the devisees under the will, although they might eventually participate in the profits of the trade. There was another point decided in that case, upon which we wish to be understood as expressing no opinion.

Upon the whole, our opinion is, that the decree of the Circuit Court dismissing the bill ought to be affirmed with costs.

### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Columbia, holden in and for the county of Alexandria, and was argued by counsel. On consideration whereof, It is now here ordered and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby affirmed with costs.