Johnson, J.
In order to understand the charges given and refused by the court below, as well as to determine *233 •their correctness, a summary of the facts developed on the trial is necessary.
Francis Neulson died in March, 1863, leaving a will, by which he devised to Ms wife “ all his property, real, personal, and mixed, absolutely and in fee simple, so long as she stays a widow and 'lives, and after her death my •children shall divide the property in equal parts among themselves.”
He left a widow and several minor cMldren, and under the will his brother, Anthony Neulson, was appointed and •qualified as executor, and served as such until 1869, when, he resigned, and the plaintiff in error was appointed his successor, to whom the assets, unadmimstered, were surrendered.
, At the time of his death, the testator had been engaged in carrying on a cigar and tobacco store, and owned the stock of goods, valued at about $7,000, and was possessed of outstanding claims about $14,000, as well as other property, real and personal, not employed in this business. The estate was largely indebted.
The executor, although not authorized by the will, nor, •so far as appears, by the consent of any one interested, carried on the testator’s former business at the old stand, from the testator’s death until sometime before his resignation in 1869.
His object in doing so, he says, was: “ Firstly, to pay the debts and sustain the family; and secondly, which was the ultimate object, it was carried on until the boys of my •deceased brother should take hold of it themselves.” With this object in view he hired one George Voige as manager •of the business and placed him in charge of the store, who •carried the business on for several years, the same as if the testator was living. The assets of the estate employed at his death in the business, represented by the stock of goods on hand and credits, were used in carrying on this new business. No steps were taken to settle up the estate or .administer these assets, as required by the statute.
*234 No distinction was made between the goods on hand or moneys collected from the old business and subsequent purchases or collections. All were used indiscriminately in prosecuting the business for the object stated.
In like manner, out of this common fund, creditors off the estate, and creditors of the business subsequent to testator’s death, were paid.
"While this was going on and some two years after testator’s death, Behrens applied to Yoige, the manager at the store, to know if he wanted to borrow some money, saying he had some to spare, if he wanted it. Yoige told him he thought he would take it; that he would see the executor.
Behrens left the money with him, and he deposited it in the bank to the same account as other deposits from the-store, giving Behrens credit on the books. When Yoige was asked if this money was needed by the estate at" the-time he got it, he says: “We needed money always, to-carry on the business as it ought to be carried on ; ” and in answer to a question as to how it was used, he says: “It was used to pay off the debts of the estate; ” and when asked what debts, he says: “The general debts- of'the-business. The money was -checked out of bank from time to time as we needed it in the progress of business ; ” and adds that $1,500 went to pay for stock.
In the mind of Yoige there was no distinction between the debts of the testator and those of the business ; all were in his mind debts of the estate.
When he was asked if this money of Behrens assisted to-make money for the estate, he says : “ It is impossible to-make a line there. The business in general made money. . . . Certainly this money must have helped.” The whole case shows most conclusively that this money was borrowed for and used in the business. The object of the executor was to keep the business up, and instead of winding up the estate, as required by law, and paying the debts of the testator out of the assets he left, the executor chose to- *235 employ these assets in trade and business, and out of the business, as it warranted, pay off the debts.
It was to carry out this plan, and while in the course of its execution, that this money was borrowed. It was used in the business, and it is claimed contributed to its success, and that the estate got the benefit of this money; and as all the creditors of the estate are paid off, the estate is liable, whether the business was profitable or not, if the executor-acted in good faith.
The right to recover of the estate the money borrowed and used for this object is the real matter in controversy.
It appears that the testator, at his death, owed Behrens some seven hundred dollars, but it further appears that this debt has been paid off, leaving now for consideration the liability of the estate as to the money borrowed after liis death and used in the business.
On the trial, the court admitted evidence in behalf of defendant in error, tending to show that the business was profitable, but refused to allow the plaintiff in error to show the contrary, on the ground that it was an immaterial issue, provided the business was conducted in good faith by the executor. This is assigned as for error. The other-errors arise on the charges of the court. These charges relate to two aspects of the case:
1. As to the liability of the estate for money borrowed by the executor and used directly in payment of debts of the estate, by which we mean debts of the testator.
2. As to such liability for money advanced and used to carry on the business by the executor, after the testator’s-death, out of which business the debts were paid.
1. As to the liability of the estate under the first aspect of the case, the charges in effect were, that if the executor in good faith borrowed money and used it .in the payment of the debts, the estate was liable to refund. •
Whether this proposition is sound law, we do not find it necessary now to determine. This money was borrowed and used in the business of the executor in carrying on the-store, and not directly to pay the debts.
*236 No attempt was made to wind up the estate, nor was the money loaned, to enable the executor to do so, but to prosecute the business. Behrens, by making this loan, did not become a creditor of the estate, but of the executor, with whatever rights he may have had, if any, in equity, to charge the property embarked in the business with his •claim.
2. As to the second aspect of the case :
In substance, the rulings of the court amount to this: ’That if the executor acted in good faith in carrying on this business with the assets, and from time to time drew out means and paid the debts of the testator, and turned the residue of the business over to the estate, it is liable for «debts contracted by him in so doing, whether the business was profitable or otherwise.
In short, if the liabilities so incurred exhausted the assets employed in the business, the new creditors could report to the general assets.
In so holding the court below lays stress on the fact that .all the creditors of the testator have been paid off, and that the contention, therefore, is only between Behrens and the ■estate, and if, in course of the business, the estate has been benefited, it is liable to its creditors. In this the fact is lost sight of that in refusing to allow defendant below to -show that the business was unprofitable, that is, that 'the estate had not in fact been benefited, the court held that that was an immaterial issue, provided the executor .acted in good faith.
The unqualified doctrine is thus announced : That if an executor in good faith continues the business of his testa-tor, without authority, for the purpose.of paying his debts, .supporting the family, and preserving the good-will and business for the minor children when they shall grow up, and in so doing incurs liabilities, .the rest of the testator’s ■estate not embai'ked in the business is liable if all the •creditors of the estate have been paid.
This, if true, would make liabilities so incurred a charge ■on the'testator’s other estate not so embarked in the b.usi *237 ness, and might defeat the disposition of property made by the will.
It is a part of this case that the executor prosecuted this-business, not only without authority of law, but without the consent of any one interested.
Neither the widow for herself, nor as the guardian of her minor children, attempted to clothe him with any power to create debts which would affect them or the estate devised, to them.
It will not be disputed that if this judgment is allowed to stand, and it turns out that the personal assets arc insufficient to pay it (and as to that we are not advised), the-real estate may be resorted to for that purpose.
By the will this real estate is devised to his wife while she lives and remains his -widow, and after that equally to his-children, thus vesting them with an estate liable for the payment of the judgment in this case. It thus appears that upon the theory of the court below the entire estate of the widow and heirs, outside of that embarked in the business by the executor, is, without authority of law or authority conferred by the will, made subject to all the perils and-hazards of the undertaking.
It has long been well settled that:
“ Contracts of executors, although made in the interest and for the benefit of the estate they represent, if made-upon a new and independent consideration, as for services-rendered, goods or property sold and delivered, or other-consideration moving between the promisee and the executors as promisors, are the personal contracts of the executors,, and do not bind the estate, notwithstanding the services rendered or goods or property furnished, or other consideration' moving from the promisee, are such that the executors could properly have paid for the same from the assets, and been allowed for the expenditure in the settlement of their-accounts. The principle is-, that an executor may disburse and use the fuuds of the estate for purposes authorized by law, but may not bind the estate by an executory contract, and thus create a liability not founded upon a contract or- *238 obligation of the testator.” Austin v. Monroe, 47 N. Y. 360. It is equally well settled that executors, in the absence of power conferred by the will, have no authority to cany -on the trade or business of their testator, and that:
“ The employment of the trust funds in trade, or any speculative undertaking, without an express authority, will, ■a fortiori, be treated as a breach of trust; and whatever may be the apparent advantages of such a course, and however well-intentioned the conduct of the trustee, there is no question but that the court will visit upon him any loss resulting from such a step, while he will have to account for any profit thus made.” Williams on Ex’rs, 1274; Hill on Trustees, 379 ; Perry on Trusts, sec. 429.
So rigid is this rule, and so careful have the courts always been to guard against the perilous consequences re■.sulting from embarking the assets in trade, that, even when the will authorizes the executor to carry on the business, he can not in so doing create liabilities against the general estate, but the creditor of such new business must look either to the business itself or to the executor individually for his pay.
In the leading case on this subject, Ex parte Garland, 10 Vesey, Jr., 109, the testator devised his personal and leasehold estate in trust, to permit his wife to receive the rents and profits during 'her life for her own use and for the support and maintenance of his minor children, and .after her death to the children ; and then directed that his trade as a miller and his farming business be canned on until the trustees should think proper to establish his sons. His wife was one of the executors, and, as directed by the -will, carried on the business until she became a bankrupt.
The action was brought to charge the testator’s other ■estate, not employed in the business with its debts.
Lord Eldon said that this could not be done; that' it would he intolerable to hold that every legatee is to hold his legacy subject to the venture in business which he can not control, and which may cut down all his hopes, as far .as they are founded on the receipt of that bounty. He adds *239 that, on the other hand, speaking of the executor: “ He be,comes personally responsible, though but a trustee.” Again, in speaking of those who are creditors, not of the testator, hut subsequent to his death, he says: “ In the first place, they may determine whether they will be creditors; next, .it is admitted, they have the whole fund that is embarked in the trade; and, in addition, they have the personal responsibility of the individual with whom they deal. . . . They have something very like a lien upon the estate embarked in the trade. They have not a lien on anything .else.”
He concludes by saying that the convenience of mankind requires him to hold that the creditors of the trade as such have no claim against the distributed assets, not embarked, and can not resort to the general assets.
In Burwell v. Mandeville, 2 Howard (S. C.) 560, when the same question was before the court, it is said: “Nothing but the most clear and unambiguous language, demonstrating in the most positive manner that the testator intends to make his general assets liable for all debts contracted in the continued trade after his death, and not merely to limit it to the funds embarked in the trade, would justify the court in arriving at the conclusion, from the manifest inconvenience thereof, and the utter impossibility of paying off the legacies bequeathed by the testator’s will, or distributing the residue of his estate, without in effect saying at the same time that the payments may all be recalled, if the trade should be unsuccessful or ruinous.”
In the case at bar, the testator disposed of all his estate, subject only to the payment of his debts, the funeral expenses, and costs of administration. No other liabilities incurred by the executor, however honestly incurred, can be made a burden on this bounty to his wife and minor ehidren.
The doctrine of the cases just cited is supported by numerous authorities, and may be regarded as well established. Richardson v. Hodgson, 3 Madd. 138; Pitkin v. Pitkin, 7 Conn. 307; Scholefield v. Eichelberger, 7 Pet. 586; *240 Laughlin v. Lorentz, 48 Pa. 275; Davis v. Christian, 15 Grattin, 11; Stanwood v. Owen, 14 Gray, 195.
Numerous cases have been cited and relied on to show that there are exceptions to the general rule, as to the liability of the estate for the contracts of the personal representative.
In Conger v. Atwood, 27 Ohio St., decided by us at the-last term, it was held that when there was a controversy between the widow and the administrator as to her title to the rents of the mansion house due from the tenant within the year, and the administrator, acting in good faith, collects these rents, and applies them to the payment of debts of a solvent estate, he was liable in his representative capacity to refund to the person entitled to collect them.
This case goes quite far enough, but it is supported by a. strong equity as -well as by authority.
In De Vallengin’s Adm’r v. Duffey, 14 Peters, 290, it was said, “ that whatever property or money was lawfully received by the-executor, in his representative character, he holds as assets of the estate, and he is liable in that character to the party who has a good title thereto.”
“ So if an executor or administrator out of his own funds-pays a debt, he becomes a creditor, and may resort to the trust fund to satisfy it.” Peter v. Beverly, 10 Peters, 566.
In Arbuckle’s Ex’r v. Tracy, 15 Ohio, 432, the executor of a surety on a note, acting in his representative character, received sundry collaterals to protect his testator’s estate from liability on the suretyship, and it was said if such executor had collected money on the collaterals, and applied them to the benefit of the estate, it would be liable, but it was not liable for conversion of these collaterals by the-executor.
To allow personal representatives of estates to go beyond this, and without authority of law, or under the will, embark the assets of an estate in trade or business, however well-intentioned they may be, and thereby subject the estate to all the hazards of the venture, would encourage that which it has been the especial policy of the law to prevent *241 —the employment of trust property in any other mode than is clearly authorized.
Eor aught we know (for the court refused to hear evidence on the subject from the defendant), this well-meant endeavor to preserve the business of the testator for his sons, while paying the debts and supporting the family out of it, may have been disastrous ; and if this judgment stands and is collected, it may defeat the express provisions of the will. If this and like claims are allowed, it may exhaust both real and personal estate to pay them, leaving nothing to the devisees under the will.
These devisees have had no voice or control in this undertaking, and their interests are proper objects of protection, as well as those of creditors of the estate. As between them and one who lends his money to carry on this unauthorized business, there can be no question that their rights in the estate not embarked in the business are paramount.

Judgment, reversed and cause remanded.